UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
In re Arbitration Between:              :
                                        :
M.B. INTERNATIONAL W.W.L.,              :        12 Civ. 4945 (DLC)
                                        :
                    Petitioner,         :        <u>OPINION & ORDER</u>
                                        :
          -v-                           :
                                        :
PMI AMERICA, INC.,                      :
MATTHEW PELHAM,                         :
                    Respondents.        :
                                        :
----------------------------------------X

APPEARANCES:

For Petitioner:
James P. Duffy
Kiran Gore
Job Seese
Josh Kane
DLA Piper US LLP
1251 Avenue of the Americas
New York, NY 10020


For Respondents:
Mark A. Baugh, <u>pro hac vice</u>
Maia T. Woodhouse, <u>pro hac vice</u>
Baker, Donelson, Bearman, Caldwell & Berkowitz
211 Commerce Street, Suite 800
Nashville, TN 37201

Eugene Kublanovsky
Fernsterstock & Partners LLP
100 Broadway, 8th Floor
New York City, NY 10005

DENISE COTE, District Judge:

The petitioner M.B. International W.W.L. ("MBI") seeks a preliminary injunction in aid of arbitration.  The arbitration addresses MBI's claim that PMI America, Inc. ("PMIA") and its President, Matthew Pelham ("Pelham"), breached a contract to provide MBI with machinery capable of manufacturing certain water filtration devices.

This action was commenced on June 22, 2012, in the Supreme Court of the State of New York, New York County.  The petitioner originally sought both a preliminary injunction and an attachment in aid of arbitration, but, as outlined below, the nature of the relief requested was narrowed during the course of pre-hearing proceedings.  On June 25, respondents removed the case to federal court on the basis of diversity jurisdiction. See 28 U.S.C. § 1332.  The Court held an initial conference to consider petitioner's application on June 26, at which time it was decided that the matter would be set down for an evidentiary hearing following expedited, targeted discovery.

Pursuant to this Court's individual practices, and with the consent of the parties, the direct testimony of the witnesses for the preliminary injunction hearing was submitted by affidavit.  MBI submitted no declarations, relying on the deposition testimony of its sole proprietor, Mohammed Baluchi

2

("Baluchi"), and that of Pelham.[1]  The defendants submitted
declarations from defendant Pelham; Dr. Ronald L. Smorada, who
had certain business dealings with the parties; and Andrew C.
Burnett on behalf of accounting firm Frazier & Deeter.  Although
both parties were invited to submit legal memoranda in support
of their proposed findings of fact and conclusions of law, only
PMIA did so.

The parties' prehearing filings were submitted to the Court
on July 23.  On July 27, a final pre-hearing conference was
conducted via telephone.  At that time, the parties agreed to
supplement the hearing record with the affidavit from Baluchi
that was submitted to the Court in support of the initial
petition for preliminary relief.  Both parties also waived any
objection to the authenticity of documents submitted as
potential hearing exhibits and clarified that they did not seek
to cross-examine any witnesses during the hearing.

During the July 27 telephone conference, the parties also
discussed whether a resolution could be reached with respect to
PMIA's obligation to deliver to MBI one manufacturing line still
due under the contract.  After further negotiations, the parties
informed Chambers on August 3 that the issues with respect to

---

[1] PMIA consented to MBI's offering Baluchi's deposition testimony
at the hearing.

delivery of the remaining manufacturing line had been substantially resolve.  MBI represented that, having achieved delivery of the third line, it would forgo its demand for an attachment and proceed only on its application for a preliminary injunction.

The preliminary injunction hearing was held on August 6, 2012.  Because neither party sought to cross-examine the witnesses of the other, the evidentiary record was complete in advance of the hearing.  The parties' presentations therefore consisted solely of argument regarding the propriety of injunctive relief.

The following constitutes this Court's findings of fact and conclusions of law.  While many of the findings of fact are contained in the next section of the Opinion, some may also be found in the final section.

BACKGROUND

MBI is a sole proprietorship in Bahrain that is wholly owned by Baluchi.  It has been in existence since 1990 and manages and operates factories in Bahrain, including factories that manufacture water filtration devices.

PMIA is a Tennessee corporation with its principle place of business in the state of Georgia.  PMIA designs and manufactures

filter manufacturing machines known as Melt-Blown Continuous
Cartridge Filter Winding Equipment.

2008 Agency Agreement

Smorada introduced Baluchi to Pelham.  PMIA and MBI
executed an Agency Agreement ("Agency Agreement") on June 20,
2008, that made MBI the "exclusive agent" of PMIA in "GCC
Middle-East and Asia".  The defined territory included Bahrain.
The parties agreed "not to compete in anyway [sic] with
machinery and technology" in that region.  The Agency Agreement
had a one-year renewable term and provided that MBI would have
"no authority to bind [PMIA] except upon written order or
authorization by [PMIA]."  Schedule A to the Agency Agreement
created a "minimum order volume."  Schedule A required a minimum
order of $2.4 million for 2008, of $2.6 million for 2009, and of
$2.8 million for 2010.

2009 Contract Between Pelican and BWTC

In the spring of 2009, MBI identified a project in Bahrain
to manufacture coreless meltblown water filters.  To pursue this
project, MBI executed a memorandum of understanding with Inovest
B.S.C. ("Inovest"), a Bahraini investment company.  Inovest
formed the Bahrain Water Technology Company ("BWTC") and Baluchi
formed Pelican Machinery International W.L.L. ("Pelican"), a
special-purpose Bahraini company, for this project.  Baluchi

owns 85% of the shares in Pelican; Pelham owns 5%; Smorada owns 5%; and the remaining 5% is owned by a Bahraini investor. Pelican, in turn, owns 20% of BWTC, a stake that was valued at $4.8 million as of May 24, 2009.

On June 1, 2009, Pelican "through Mr. Mahmood Baluchi" signed a contract with BWTC "through Dr. Khalid Abdula," committing Pelican to supply BWTC with four machine lines capable of manufacturing coreless meltblown water filters ("Lines"). The manufacturer of the Lines was identified as PMIA. The Contract explained that one of the shareholders in the manufacturer was also a shareholder in Pelican. In a separate undertaking signed on June 10, Pelham ratified PMIA's obligations as manufacturer under the contract between Pelican and BWTC.

PMIA shipped the first Line in July 2010. As of March 2012, it remained in need of repairs. A test of Line 1 was performed on April 17, 2012. Pelham represents that those tests indicate that Line 1 has a better than 97% efficiency rating. The record does not indicate whether Line 1 has begun to operate.

2011 Manufacturing and Supply Agreement

On June 3, 2011, MBI, PMIA, Pelham, and Smorada entered into a Manufacturing and Supply Agreement ("Agreement"). The

two companies and the two individual were identified in the
opening paragraph of the Agreement as the "Parties" to the
Agreement.  Baluchi and Pelham signed the Agreement for MBI and
PMIA, respectively.  Pelham listed his title as President.
Smorada signed next to a line indicating that he was signing the
Agreement "in his personal capacity".  There was no second
signature line for Pelham to sign in his individual capacity
even though he is identified as a party to the Agreement.

   As described in the Agreement, the parties desired that
PMIA "continue to manufacture" the Lines ordered by MBI, and
that it do so "pursuant to a more formal written agreement."
The Agreement provided that MBI could issue Purchase Orders for
equipment to PMIA, which PMIA would be given ten business days
to accept or reject.  If PMIA accepted a Purchase Order, it was
required to supply the number of machines specified in the Order
according to the timeframe set forth therein.  PMIA's duties
under the Agreement also included the assembly and testing of
any Lines it manufactured for MBI, but the Agreement also
provided that "[t]he initial installation of any Product shall
be made at the expense of MBI."

   The Agreement granted Smorada, or "any other person
appointed by MBI," the right to "inspect the work conducted and
services provided by PMI[A] under this Agreement".  Smorada was

a guarantor of PMIA's duty to deliver any Line due under the Agreement.[2]

The Agreement contained an exclusivity provision, Paragraph 7, which reads:

> during the Term of this Agreement, and for a period of two (2) years from the effective date of this agreement neither PMI[A] nor [Mathew Pelham] shall sell Competitive Products to any purchaser or manufacturer located in the Middle East North Africa Region (MENA Region) without approval from MBI.

A "Competitive Products" is defined in the Agreement as a "product that is competitive directly with the Product." The "Product," in turn, is defined as "Continuous Meltblown Cartridge Filter Machine, as further described in the Specifications in Exhibit A."  Though difficult to read, Exhibit A appears to be a list of machinery and parts.

The parties agreed that a breach of Paragraph 7's exclusivity provision would cause "irreparable harm and significant injury to the non-breaching Party which may be difficult to ascertain.  Accordingly, the parties agree that each party shall have the rights and remedies available to a contracting party under the Uniform Commercial Code."

---

[2] According to Pelham, PMI has an agreement with Smorada to pay him a 10% commission on this project, and paid him $300,000 in 2009 pursuant to that agreement.

The Agreement also included confidentiality provisions and limitations on liability.  The Agreement declared that it was to "be construed in accordance with and governed by" the law of Georgia without giving effect to any choice of law rules.

An arbitration clause required any dispute to be submitted to arbitration in New York.  The Agreement provided, however, that the arbitration requirement did not prevent any part from "seeking, or a court of competent jurisdiction from granting, a temporary restraining order, temporary injunction or other equitable relief from any breach of any restrictive covenant or confidentiality covenant in this Agreement."

The Agreement's term ran for two years from its effective date of June 3, 2011.  Any party was permitted to terminate the Agreement

> in the event that (a) the other Party materially breaches any material provision of this Agreement and such breach continues for a period of thirty (30) calendar days following the receipt by the defaulting Party of written notice of such breach (provided, that if such breach is incapable of being cured, such termination may be effective immediately), or (b) the other Party becomes insolvent, is adjudicated bankrupt, voluntarily or involuntarily files a petition for bankruptcy, makes an assignment for the benefit of creditors, seeks any other similar relief under any bankruptcy law or related statues or otherwise becomes financially incapable of performing its obligations in accordance with the terms of this Agreement, and such judgment, assignment or incapacity is not revoked within ninety (90) calendar days.

9

All notices were to be sent in writing by U.S. Mail or courier service or by facsimile with a confirmatory copy mailed to the addresses identified in the Agreement.

Finally, the Agreement provided that, in the event of termination, any purchase order which was "to be fulfilled after the expiration or termination of [the] Agreement [would] survive such expiration or termination, as [would] any terms [thereof] necessary with respect to the fulfillment of such Purchase Order as well as any and all monies due."

Exhibit B to the Agreement was designated as a "Purchase Order" and provided a schedule of payments as follows: payment of $850,000 for the execution of the Agreement; $1 million on July 15, 2011, upon presentation of a bill of lading for the second shipment; $1 million on August 20, 2011 for the installation of Line 1; $500,000 on September 15, 2011 to begin installation of Line 2; and $500,000 "Prior to Shipping Line 3 Upon Presentation of bill of lading for 3rd Shipment (All Remaining Equipment)".  Together, these five commitments amount to payment of $3.85 million.

Payments to PMIA: Execution of the Agreement to November 2011

MBI made its payment of $850,000 for execution of the Agreement, albeit in two installments and a few days late.  Line 2 was shipped in two components in July and September 2011.  MBI

10

paid $1 million to PMI for the shipment of Line 2.  MBI also paid PMIA at least $800,000 in September towards the payment due upon the completed installation of Line 1.  The parties dispute whether MBI withheld the remaining $200,000 because Line 1 was not yet fully functional.  At various points, the respondent admits the he was paid $1 million for Line 1, but bank deposit records indicate a payment of only $800,000.  As of November 1, MBI had not yet made any payments towards the $500,000 due upon beginning installation of Line 2.  Even though the Agreement expected that PMIA would begin that work in September 2011, as of July 17, 2012, Line 2 was not yet installed.

On November 8, 2011, Pelham executed a document entitled "Appendage 1 to Addendum to Supply Agreement/Verification of Line 3 Shipment and Receipt of Funds for Balance Payments."  It provided:

> PMI America verifies it will ship Line 3 in its entirety on or about December 9, 2011 as provided in the Addendum to the Supply Agreement of June 3, 2011.
> In order for this to occur there is a timing issue that is critical.  In order to be able to ship on December 9, all of the remaining key components (including extruders and Die/Die Assemblies) must be received in timely manner for pre assembly and testing at PMI[A].  This requires receipt of the wire of $500,000 no later than November 15.  (Note) November 24 and 25 are National Holidays in the USA.  PMI[A]'s vendors will only ship after receipt of our final payment.

> If the funds are not received by this date then
> PMI will ship Line 3 at least 3 weeks following
> receipt of funds." (Emphasis supplied.)

On November 23, MBI wired $500,000 to PMIA. With this
payment, as of November 23, 2011, MBI had paid PMI $8.35 million
towards the manufacture and installation of all three Lines.
This included $3.15 million wired to PMI between June 5 and
November 23, 2011. Under the terms of the Agreement, MBI owed
PMIA a balance of $200,000 towards the Line 1 target. PMIA was
also entitled to one more payment of $500,000 for the shipment
of Line 3 and remaining equipment "Upon Presentation of bill of
lading."

The Relationship Sours Further

Despite receiving the $500,000 payment from MBI in
November, PMIA did not present Line 3 for shipment in December
as promised. In late November, Pelham corresponded by e-mail
with Hazim Buali, a former Inovest employee, who asserted that
Inovest had advanced MBI "nearly" $15 million in cash for the
BWTC project. In December 2011 Pelham seems to have made
efforts to renegotiate the payment schedule in Exhibit B of the
Agreement. The negotiation was contentious; on January 2, 2012,
Baluchi wrote to BWTC and asked that Pelican's 20% ownership
stake in the company be transferred to MBI.

12

For approximately two months beginning in mid-February, MBI tried to entice PMIA to complete its work on the project -- including the installation of Lines 1 and 2, which was to have occurred in 2011, and the shipment and installation of Line 3. MBI was hesitant to advance further money to PMIA, however, without evidence that PMIA was meeting the Agreement's benchmarks.

On February 16, 2012, MBI's attorneys wrote to Pelham. They explained that

> It is our understanding that you are demanding payment of US$500,000 before delivery of Line 3, a term that is in direct contravention with the Contract. It is also our understanding that there have been many attempts to contact you by [MBI] and its agents to discuss a mutually agreeable solution to this subject but they have been unable to directly reach you.

MBI offered to issue a letter of credit in the requested amount payable in two installments. The first installment, in the amount of $300,000, would be due when PMI procured a bill of lading certifying that all missing components for Line 2 and all of Line 3 were included in the shipment. The remaining $200,000 would be paid when PMIA repaired Line 1, and completed the installation and start-up of Lines 2 and 3. MBI offered to make a "further" payment of $200,000 once the three Lines were in "full operation and filters are up to certified standards for sale."

13

On February 26, Pelham demanded $500,000 prior to shipping Line 3 and indicated that Line 3 was ready for inspection by Smorada.  Pelham represented that his brother Glenn Pelham, MBI's Head of Operation, indicated that Line 1 was functioning well and only needed "minor adjustments and recipe development" before it could go "into full production."

In a March 2 e-mail, Pelham appeared to reconsider MBI's February 16 offer to advance a letter of credit payable in two installments.  He blamed his brother for problems with the project and represented that "Line 3 is ready to be inspected and shipped."  When asked for a detailed plan "to complete the machine and bring it up to functionality (including fixing Line 1, installing line 2, and shipping and installing line 3)," Pelham explained that "we can ship line 3 almost immediately. (we would want $300k prior to shipping)".  Pelham offered to send technicians to work on Line 1 and a team to install Lines 2 and 3, for two payments of $200,000.  This constituted a request for the remaining $700,000 due under the contract in exchange for work on all three Lines.

On March 18, MBI responded with a draft "First Addendum" to the Agreement that included a schedule for the payment of $700,000.  The draft proposed that Smorada would inspect Line 3, that PMIA would remedy any deficiencies, that PMIA would then

14

procure a bill of lading, and that MBI would pay PMIA $300,000 within three days of receipt of a copy of the bill of lading. It also contemplated two additional payments of $200,000: the first after Line 1 was repaired and Line 2 was installed; the second after Line 3 was installed.

On March 19, Pelham responded with a request for payments amounting to $809,784.  Specifically, Pelham requested $250,000 to install and start Line 1; $109,784 for "previous field service"; $100,000 to start Line 2; $250,000 prior to shipping Line 3; and $100,000 to start Line 3.

On March 22, MBI rejected Pelham's demand and threatened to enforce its rights.  It reminded Pelham of the terms of the Agreement.  In response, Pelham appeared to acknowledge the Agreement's terms.  He represented that PMIA would produce a bill of lading for Line 3 "immediately, or at your request, we will allow an inspector to see the equipment."

Responding to Pelham's apparent agreement, on March 26, MBI asked Pelham to fill in the time frames contained in the "First Addendum".  It added that once Smorada had inspected and approved Line 3, PMIA could procure a bill of lading and MBI would pay PMIA $300,000, with the $400,000 balance to be paid once all three lines were operational.  Because MBI took the position that PMIA had not yet begun installation of Line 2, it

15

calculated that the $300,000 initial payment would amount to $100,000 more than the Agreement contemplated based on PMIA's performance to date.  Once all three lines were operational, the payment of the final $400,000 would satisfy MBI's obligations under the contract.

But, Pelham changed course.  In an e-mail dated March 29, Pelham rejected the payment schedule in the "First Addendum." He again asserted that MBI owed PMIA $109,000 for installation services that were not governed by the Agreement.  He also took issue with MBI's assertion PMIA had not substantially performed with respect to Lines 1-3.

MBI responded in an e-mail dated April 23, reiterating its position that "[t]he fact that any money has been paid in relation to Line 2 puts PMI[A] ahead of what is owed considering the language of Exhibit B."  MBI offered to wire $250,000 immediately upon presentation of a bill of lading for Line 3, with another $250,000 to be wired upon arrival of the equipment in Bahrain.  The remaining $200,000 would likewise be paid in two installments: half upon the arrival of a PMIA installation team in Bahrain and the other half once all three lines were up and running.

At this point, it appeared that Pelham was unwilling to provide a bill of lading as a condition to payment for Line 3

and wanted more money than contemplated by the Agreement to complete his obligations under that document.  The parties were at an impasse.

May 2012 Communication Between BWTC and Pelham

The delays in installation of the Lines exasperated BWTC. Apparently, Baluchi sought to pacify BWTC by misrepresenting the nature of Lines 1 and 2.  On May 24, Dr. Khalid Abdulla, a Board Member of BWTC, wrote to Pelham as the manufacturer of the Lines.  He explained that Pelican was claiming that the four Lines had been installed.  According to Pelican, the two Lines in Bahrain were "actually four lines which have been combined into two for better quality and other technical reasons."  BWTC did not accept this situation and wanted to know the status of the two remaining Lines.

Without telling MBI, Pelham flew to Bahrain at BWTC's expense and discussed how to complete work on the Lines.  On May 31, 2012, Pelham wrote to Mohammed Abdul Khaliq of Inovest and reported on his trip.  According to Pelham, Line 1 was ready for production.  Line 2 was installed and needed two more weeks of work.  As for Line 3, it was ready for inspection and shipment. Pelham added that MBI had "no legal interest in any of this" and that Pelham hoped to recover the monies paid by BWTC to Pelican "which I suspect were diverted to personal interests of Mr.

17

Baluchi."  Pelham signed the letter as president of PMIA and
shareholder and member of the board of directors of Pelican.
That same day, Pelham gave notice in an e-mail to Baluchi that
"all contracts between PMI[A] and MBI are null and void."[3]

     In the early morning of June 1, Pelham and Khaliq exchanged
e-mails in which Khaliq appeared to suggest that Inovest was
contemplating legal action against MBI.  Pelham wrote wrote, "I
cannot stand by while this guy walks off with $12 million that
he does not deserve!! . . . I am going to fight him for this and
Truth will prevail as sure as there is one God!"  Khaliq
responded that it would be important for Inovest and PMIA to
"liaise with each other the actions and more important the
timing." He expressed concern that, "[k]nowing [Baluchi], if he
learns about what we are doing then he might go to court first
in order to cause damages to us."

June 1 Threats

     In a series of e-mails to Baluchi on June 1, Pelham
demanded $5 million and threatened Baluchi with harm.  The e-
mails included the following statements:

     • If you put $5 million in an account and walk away
       you will do well if not, I fear for you.

_____

[3] PMIA does not contend in this action that Pelham's notice
terminated the Agreement.  It agrees that the contract remains
effective and binds PMIA.

- If you care about yourself and your family, as I do, you need to stop playing stupid games.  You have put me and my family at risk and I cannot accept that.  Do what I say!!

- You are being prepared for execution in those places that supposedly do not exist to westerners.  I was in Bahrain two days ago as I heard graphic details of your fate.  I don't like you but I never want to see what people like you endure when they lie to these guys.  Just turn it over and walk.  Ok?  But put $5 million in the account or you will be very sorry.

- This is your last opportunity to leave with your freedom.  Put the $5 million you received for this project in escrow or suffer consequences.  BWTC paid us and you embezzled it.

- Mahmood, You are on the highway to Hell and Ron nor Glenn nor I deserve this.  You are going headlong into the abyss by yourself!  Do it easy!  Do what I tell you or else the consequence will be more than you and your family should bear.

- Leave $5 million in our account or suffer grave consequences.  This is not a game.  You stole a lot of money and those guys are pissed!!

- Relent, or I will watch the Prince of Saudi Arabia skin you alive!  You stepped in major ---- when you screwed these guys and I will NOT be there with you.

MBI Responds

     On June 3, counsel for MBI wrote to BWTC and Inovest.  The letter indicated that "Mr. Baluchi was recently made aware by Matthew Pelham . . . that correspondences [sic] have been taking place between BWTC, Inovest, and Mr. Pelham pursuant to which

Mr. Pelham has offered various services to BWTC." MBI went on to describe the Agreement between it and PMIA and PMIA's record of inadequate performance. The letter quoted the exclusivity provision in Paragraph 7 of the Agreement and notified BWTC and Inovest that any agreement on their part to procure equipment directly from PMIA would violate the Agreement and could give rise to an action for tortious interference with contract. The letter closed by quoting from Pelham's June 1 e-mails to Baluchi and suggesting that "companies as esteemed and reputable as BWTC and Inovest would not be interested in doing business" with an individual such as Pelham. The same day, counsel for MBI wrote to Pelham to inform him that he had been removed as a director of Pelican.

On June 6, MBI filed a demand for arbitration against PMIA and Pelham. In its statement of claim, MBI asserts that PMIA and Pelham have breached their obligations under the Agreement by: 1) failing to deliver a fully functional Line 1; 2) failing to deliver a complete Line 2; 3) refusing to deliver Line 3 at all; 4) improperly terminating the Agreement; and 5) breaching the Agreement's exclusivity and confidentiality obligations. MBI also asserts that Pelham has defamed it through his statements in the June 1 e-mails to Baluchi. The statement of claim seeks, principally, $5 million in damages and an

injunction to prevent PMIA and Pelham from breaching their exclusivity and confidentiality obligations.  The party-appointed arbitrators have nominated a chair, and a status conference is expected to take place the week of August 13.  MBI has moved for a preliminary injunction in the arbitration proceeding and expects a ruling on that application in late-September or early-October.

On June 26, 2009, PMIA responded by filing an action against MBI in the U.S. District Court for the Northern District of Georgia.  See PMI America, Inc. et al. v. M.B. International et al., No. 12 civ. 2293 (TCB) (N.D. Ga.) (the "Georgia Action").  The complaint in the Georgia Action seeks a declaration that Pelham is not personally a party to the arbitration proceeding and a stay of the arbitration proceedings until that matter is litigated.  PMIA represented during the August 6 hearing it is seeking to stay the arbitration only with regard to MBI's claims against Pelham individually.  The complaint in the Georgia Action also alleges that MBI and Baluchi have misappropriated PMIA's trade secrets and intend to use them to build Line 4 for BWTC and Inovest without PMIA's involvement.  MBI is due to respond to the stay motion by August 10.

As referenced above, in the days leading up to the preliminary injunction hearing in this case, the parties reached an agreement with regard to the shipment of Line 3 and the $500,000 payment due upon presentation of a bill of lading for that shipment.  On July 27, a representative of MBI inspected Line 3 at PMIA's factory in Georgia, and concluded that it was sufficiently complete for shipment to Bahrain.  On August 3, MBI represented to the Court that it had finalized arrangements with a financial institution in Bahrain to release the $500,000 payment upon PMIA's presentation of a bill of lading, which PMIA agreed to procure by August 8.  MBI acknowledged during a telephone conference with Chambers on August 3 that the delivery of Line 3 averted the need for an attachment in aid of arbitration.

## DISCUSSION

Though there remain many issues to be resolved in the arbitration and the Georgia Action, the merits of the parties' positions in those other fora are not before this Court.  As narrowed in light of the parties' pre-hearing negotiations, the focus of this proceeding is whether MBI is entitled to a preliminary injunction in aid of arbitration.  Although the record before this Court indicates strongly that the

22

petitioner's underlying breach-of-contract claims have merit, the Court concludes, for the reasons that follow, that MBI has not made the necessary showing to entitle it to the extraordinary relief of a preliminary injunction in aid of arbitration.

I.  Preliminary Injunction Standard

The parties dispute whether MBI's application for a preliminary injunction is properly analyzed under federal or state law.  "[I]t is settled," however, that "once a case has been removed to federal court . . . federal rather than state law governs the future course of proceedings."  Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423, 437 (1974).  Unlike Federal Rule of Civil Procedure 64, which governs attachment in federal court, Rule 65, which governs injunctions, does not incorporate state-law standards for granting relief.  Accordingly, "[t]he question whether a preliminary injunction should be granted is generally one of federal law even in diversity actions, though state law issues are sometimes relevant to the decision to grant or deny."  Baker's Aid v. Hussmann Foodservice Co., 830 F.2d 13, 15 (2d Cir. 1987).[4]

---

[4] Although the Second Circuit considered the requirements of New York's injunction-in-aid-of-arbitration provision, NY CPLR 7502(c), in SG Cowen Sec. Corp. v. Messih, 224 F.3d 79, 81-85

In considering whether to enter a preliminary injunction
under Rule 65, federal courts in this Circuit engage in a four-
step analysis.  First, the court must assess whether the
plaintiff has demonstrated "either (a) a likelihood of success
on the merits or (b) sufficiently serious questions going to the
merits to make them a fair ground for litigation." Salinger v.
Colting, 607 F.3d 68, 79 (2d Cir. 2010).  Second, it must be
shown that the plaintiff is likely to suffer irreparable injury
in the absence of an injunction.  Unless a federal statute
specifically authorizes a "departure from the long tradition of
equity practice," the court may not presume that the plaintiff
will suffer irreparable harm.  Id. at 80 (citation omitted).
"Instead, the court must actually consider the injury the
plaintiff will suffer if he or she loses on the preliminary
injunction but ultimately prevails on the merits, paying
particular attention to whether the 'remedies available at law,
such as monetary damages, are inadequate to compensate for that
injury.'" Id. (quoting eBay v. MercExchange, LLC, 547 U.S. 388,

---

(2d. Cir 2000), the parties in that case appear not to have
raised the issue of whether the application for an injunction
should properly have been analyzed under federal rather than
state law.  In any event, the court's conclusion that CPLR
7502(c) incorporates the equitable criteria traditionally
required for granting preliminary injunctive relief renders the
federal- / state-law distinction largely academic.  Id. at 84.

391 (2006)).  Third, a preliminary injunction may be entered

only if the court concludes that the balance of hardships

between the plaintiff and the defendant "tips in the plaintiff's

favor."  Salinger, 607 F.3d at 80.  "Finally, the court must

ensure that the public interest would not be disserved by the

issuance of a preliminary injunction."  Id. (quoting eBay, 547

U.S. at 391).

II.  Application

A.  Likelihood of Success on the Merits

    The first prong of the preliminary injunction analysis

considers whether the petitioner has shown a substantial

likelihood of success on the merits.  As noted, the record

before the Court suggests powerfully that MBI will be able to

succeed at arbitration on at least some of its breach-of-

contract claims against PMIA.  The Agreement is governed by

Georgia law, and, as in most jurisdictions, the "[t]he elements

for a breach of contract claim in Georgia are the (1) breach and

the (2) resultant damages (3) to the party who has the right to

complain about the contract being broken."  Estate of Pitts v.

City of Atlanta, 719 S.E.2d 7, 11 (Ga. App. 2011).

    PMIA indisputably had an obligation under the Agreement to

deliver three working manufacturing lines to MBI on the

timetable set out in Appendix B to the Agreement.  As outlined

25

in the Court's findings above, however, PMIA consistently failed
to meet deadlines, delivered partially complete or non-working
products, and demanded advances in the payment schedule agreed
to between the parties in June 2011.  The record further
demonstrates that because of these breaches by PMIA, MBI has
spent additional funds to procure missing parts for Lines 1 and
2 and to hire third-parties to assemble, test and troubleshoot
the two lines.  Although PMIA has asserted that the Agreement is
unenforceable because it was fraudulently induced, it has
offered no evidence to support that claim other than the
testimony of Pelham, whose history of false promises and self-
serving representations renders him an unreliable witness.[5]  MBI
is thus likely to recover damages from PMIA for breach of the
Agreement.

Yet the issue for the Court is not whether MBI is likely to
succeed on its breach of contract claims generally, but whether
the particular claim that it seeks to protect through a
preliminary injunction has merit.  Through this proceeding, and
ultimately through the arbitration, MBI seeks to enjoin PMIA and
Matthew Pelham individually from violating the exclusivity and

---

[5] It is noteworthy that at the August 6 argument, PMIA implicitly
abandoned any claim that the Agreement was fraudulently induced.
It admitted that PMIA was bound by the Agreement and its
arbitration provision.

confidentiality provisions of the June 2011 Agreement.  Although
MBI argues that these provisions bind Pelham personally and not
merely in his capacity as President of PMIA, that contention is
highly questionable.  Georgia law is clear that "a single
signature generally denotes that the person is signing in either
an individual or representative capacity, but not both."  Groth
v. Ace Cash, 623 S.E.2d 208, 210 (Ga. App. 2005).  In order to
avoid this rule, the contract must "unequivocally state" that
the signatory intends to be bound both officially and
personally.  Id.; see also Elwell v. Keefe, 718 S.E.2d 587, 589-
90 (Ga. App. 2011).  And here, despite the fact that Pelham is
identified as a separate party to the Agreement, because he
signed the document only once and in a space reserved for PMIA,
the parties' intent is at least ambiguous.

    MBI is likely to have greater success in its efforts to
enjoin PMIA from violating the exclusivity and confidentiality
provisions of the Agreement.  There is no dispute that PMIA is a
party to the 2011 Agreement, or that Pelham, as an officer of
PMIA, would be bound to abide by any injunction entered against
the company, at least while acting in his official capacity.
See People of N.Y. ex rel. Vacco v. Operation Rescue Nat., 80
F.3d 64, 70 (2d Cir. 1996).  Indeed, he is specifically named in
Paragraph 7.  Nor is there a significant likelihood that the

provisions at issue will found by the arbitrator to be
unenforceable.  Confidentiality provisions have been upheld by
the Georgia courts as a valid means of protecting private
business documents.  See Professional Energy Mgmt., Inc. v.
Necaise, 684 S.E.2d 374, 379 (Ga. App. 2009).  As for the
exclusivity provision, Georgia law permits enforcement of
restrictive covenants between artificial entities so long as the
restriction at issue is "reasonable as to time, scope and
territorial limitation." Paragon Techs., Inc. v. InfoSmart
Techs., Inc., 718 S.E.2d 357, 358-89 (Ga. App. 2011) (citation
omitted).  Paragraph 7 clearly passes muster, as it applies only
in the MENA region and terminates in June 2013.  Moreover, as
discussed, it is likely that MBI will be able to prove that,
beginning in May 2012, PMIA breached the exclusivity provision
by negotiating directly with BWTC to deliver Line 3 and
additional parts necessary to render Lines 1, 2, and 3
operational without the participation of MBI.  In light of the
unambiguous language of Paragraph 7, there is no merit to PMIA's
contention that transactions with BWTC are somehow exempt from
the exclusivity obligation.

B.  Irreparable Harm

     Yet although MBI has shown convincingly that PMIA is bound
by the Agreement's confidentiality and exclusivity provisions,

the record does not establish that a preliminary injunction is necessary to avoid irreparable harm to MBI in advance of the arbitrator's final judgment.  "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  Faiveley Transport Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted).  "To satisfy the irreparable harm requirement, [the petitioner] must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted).

The Second Circuit has rejected the proposition "that irreparable harm must inevitably be assumed in breach of covenant cases."  Baker's Aid, 830 F.2d at 15.  "Though courts often issue preliminary injunctions when it appears likely that the plaintiff will prevail in covenant-not-to-compete cases, this is not an automatic process, but instead depends upon the factual particulars in each case."  Id.

As noted, the Agreement at issue here provides that "any breach of [the exclusivity provision] . . . shall cause irreparable harm and significant injury to the non-breaching

29

party which may be difficult to ascertain."  Under the controlling case law, the Court may consider this language as an admission by PMIA that any violation of Section 7 will cause irreparable harm, but the Court remains obliged to make an independent determination as to whether injunctive relief is appropriate.  Compare North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38, 49 (2d Cir. 1999) (noting the contractual admission); Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999) (same); with Baker's Aid, 830 F.2d at 16 ("[C]ontractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate.").

    Here, notwithstanding PMIA's admission that a completed violation of the exclusivity clause would result in irreparable harm to MBI, the record does not establish that a violation of either the exclusivity clause or the confidentiality clause requires an injunction in aid of arbitration.  Such a finding is necessary, because a preliminary injunction is "an extraordinary and drastic remedy," Munaf v. Geren, 553 U.S. 674, 689 (2008) (citation omitted), that should only be granted where there is a concrete threat that party conduct, if not enjoined, will frustrate the arbitrator's ability to do justice at the conclusion of the arbitration.  See Winter v. Nat'l Res. Def.

Council, Inc., 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

The record before the Court is devoid of any evidence that PMIA has used or disclosed any confidential information belonging to MBI, nor is there any indication that it has made plans to do so in the future.  There is thus no merit to petitioner's claim that a preliminary injunction is necessary to enforce MBI's rights under the terms of the confidentiality provision.

The petitioner has made a strong showing with regard to the exclusivity provision, but there too the high bar for injunctive relief has not been met.  In an effort to show that a violation of the exclusivity provision is imminent, MBI points primarily to the late-May/early-June correspondence between Pelham and representatives of Inovest and BWTC.  These communications provide evidence that Pelham hopes to sell machinery directly to Inovest/BWTC, cutting out MBI and violating the exclusivity clause.  Yet the majority of these communications concern the delivery of Line 3, and, as noted, the parties have now agreed that the equipment in question will be delivered to MBI within

31

the coming week.  Apart from this third Line, there is no
indication in the record that PMIA is prepared at any time in
the near future to ship equipment to BWTC or any other potential
purchaser.  This inability in the near term to manufacture or
ship any products that compete with the three Lines governed by
the Agreement makes it substantially less likely that PMIA can
"sell Competitive Products" without MBI's approval before the
Agreement expires in June 2013.  As MBI has failed to show that
there is an imminent risk that PMIA will violate Paragraph 7 of
the Agreement before the arbitrators have the opportunity to act
within the next two months, MBI's application for a preliminary
injunction must be denied.

C.  Remaining Issues

     Because the petitioner has failed to establish an imminent
risk of irreparable harm with regard to either the exclusivity
or confidentiality provision, the balance of equities between
the parties and considerations of public interest may be
addressed summarily.  Although an injunction is not warranted,
MBI has shown that the balance of equities tips decidedly in its
favor.  It has fulfilled its contract obligations, while PMIA
has repeatedly failed to abide by the duties imposed on it under
the Agreement.  PMIA's failure to manufacture equipment on the
timetable it promised and its delivery of inferior equipment

jeopardized the reputation of both PMIA and MBI in the Middle East.  International commerce requires courts and arbitrators to enforce the terms of written contracts among parties from different countries and to provide certainty in commercial relationships.  Pelham's efforts to renegotiate the terms of the Agreement, and indeed to extort millions of dollars to which he is not entitled through threats and backdoor machinations should not be permitted to trump the parties' contract.

Finally, it should be noted, that the Court's conclusion today that present circumstances do not warrant the imposition of a preliminary injunction does not leave the petitioner without a remedy should PMIA take action in the future to skirt its ongoing obligations under the Agreement.  Indeed, within a few weeks, an arbitration panel will be seated that is capable of granting the petitioner the relief it seeks.  Having considered the merits of the petitioner's application and having found it wanting, the Court takes comfort in the fact that, in short order, the forum that the parties have chosen for resolving the merits of their dispute will be available to them.

CONCLUSION

MBI's application for a preliminary injunction in aid of arbitration is denied.  The Clerk of Court is directed to close this case.


SO ORDERED:

Dated:    New York, New York
          August 6, 2012

                              _____
                              DENISE COTE
                              United States District Judge